UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JOSEPH LEONETTI, *personally and as Personal Representative of the Estate of Holly Leonetti, deceased,* | Civ. No.: 3:16-CV-00014-AC |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| PATRICK BRAY; LISA SHIPLEY; ANTHONY KOLLIAS; CLINT PIERCE, and CLACKAMAS COUNTY, *a political subdivision of the State of Oregon,* | |
| Defendants. | |

_____

ACOSTA, Magistrate Judge:

*Introduction*

In 2013, Plaintiff Joseph Leonetti ("Leonetti") was arrested and indicted on four counts of

first degree sexual abuse.  The prosecution, at the behest of the alleged victim's family, voluntarily

dismissed the charges.  Leonetti now brings this suit personally and on behalf of his deceased wife,

Holly Leonetti, against the investigators of his case:  Clackamas County and Clackamas County

Sheriff's Office ("CCSO") employees Anthony Kollias, Clint Pierce, Patrick Bray, and Lisa Shipley

(collectively, "Defendants").  He alleges civil rights violations under 42 U.S.C. § 1983 and state law

claims of false arrest, malicious prosecution, and, on behalf of Holly Leonetti, loss of consortium.

Presently before the Court is Defendants' motion for summary judgment.  For the reasons set forth

below, Defendants' motion should be GRANTED.

*Background*

On Friday, June 7, 2013, a Clackamas County patrol sergeant informed his friend and

colleague, Defendant Sergeant Anthony Kollias ("Kollias"), that the patrol sergeant's 13-year-old

daughter, P.D., had disclosed to her mother that Leonetti, her then soccer coach, had inappropriately

touched her on multiple occasions.  (Declaration of Jan K. Kitchel, ("Kitchel Decl.") (ECF No. 34),

Ex. 1(ECF No. 34–1) at 139, 141;[1] Declaration of Robert E. Franz, Jr., ("Franz Decl.") (ECF 21),

Ex. 107 ("Kollias June 11 Report") (ECF 21–7) at 3; Ex. 109 ("June 10 P.D. Interview") (ECF 21–9)

at 6.)  P.D.'s family and the Leonettis were friends at the time.  (Kollias June 11 Report at 3.)  P.D.

and her friend, V.D., had been discussing the touching within earshot of P.D.'s mother, when V.D.

suggested she should tell her mother.  (Kollias June 10 Report at 3; Franz Decl., Ex. 108, ("Bray

June 10 Report") (ECF No. 21–8) at 3.)  P.D. agreed and told her mother that Leonetti "had been

reaching into her panties" when she spent the night at the Leonetti household during sleepovers with

---

[1] The parties have provided supporting documentation including different excerpts of the same depositions, and each has cited these materials differently.  For purposes of this Findings and Recommendation, the court cites the materials in the record according to their respective ECF numbers and corresponding ECF pagination.

her friend, Leonetti's daughter, C.D.  (Kollias June 11 Report at 3.)

I.      June 10 P.D. Interview.

The following Monday, Kollias met with CCSO Detectives Lisa Shipley ("Shipley") and Patrick Bray ("Bray") to discuss the case.  (*Id.*)  Kollias dispatched Shipley and Bray to P.D.'s school to interview P.D.  (*Id.*)    P.D. struck the detectives as "easy to communicate with" and "very forthcoming in what she knew and remembered."  (Bray June 10 Report at 2.)  P.D. explained she had spent the night at her friend C.D.'s house "a couple times" and that during the sleepovers, the girls would watch movies on an L-shaped couch in the Leonetti family room.  (P.D. June 10 Interview, at 8–9.)  Leonetti would watch with them, then turn off the television once the girls fell asleep.  (*Id.* at 9.)  P.D. said Leonetti's wife, Holly, would typically be asleep by the time the girls fell asleep, because she was "so sick" fighting cancer and "had a hard time walking."  (*Id.* at 20, 37.)

P.D. told the detectives, "the first time, [Leonetti] tried touching me, and so I just kind of rolled over and [] tried to snuggle up in the blanket, because I didn't want to say anything, because I didn't know what to do."  (*Id.*)  P.D. stated Leonetti started by touching her buttocks and would "then kind of move forward" to her vaginal area.  (*Id.* at 16.)  This "happened about five times, and the fifth time, the farthest he tried," involved Leonetti reaching into P.D.'s underwear before she "grabbed the sleeping bag, and just completely rolled up," pretending still to be asleep.  (*Id.* at 9.)  When Bray asked P.D. how she slept on the couch, she thought she had been in a sleeping bag, which Leonetti would "zip[] halfway down" to touch her, though elsewhere in the interview, she referred to a "blanket."  (*Id.* at 9, 33.)  P.D. said she had disclosed the abuse to only her mother and two friends, V.D. and L.D.  (*Id.* at 16–18, 29.)

PAGE 3 - FINDINGS AND RECOMMENDATION                              [AHS]

P.D. had difficulty recalling exactly when these incidents had occurred, but she remembered it was during the previous soccer season, "somewhere near the winter.  In the fall," when P.D. was 12 years old.  (*Id.* at 14.)  She later told the detectives she had been sleeping at the Leonettis' for the "past couple years," (*Id.* at 33.)  Her terminology as to the frequency of the abuse also varied somewhat through the interview:  P.D. stated she had slept over with C.D. "a couple times,"  (*id.* at 8), then "a lot," *(id.* at 22), then "every other weekend," *(id.* at 33), and that Leonetti had touched her "a couple times," *(id.* at 9), "about five times," (*id.*), and "five times, (*id.* at 5, 14.)

II.    Leonetti's First Arrest.

Based on the interview, Kollias reported the abuse to the Department of Human Services ("DHS").  (Kollias June 11 Report at 3.)  When a records check on Leonetti yielded an Oregon City address, Kollias contacted Detective Sergeant Justin Young with the Oregon City Police Department to inform him of the report and decide which department would take the case.  (*Id.*)  Young and Kollias decided Clackamas County and Oregon City would "co-investigate" the allegations, and Young assigned Oregon City Detective Andy Kiesel to the case.  (*Id.*)

Meanwhile, Bray and Shipley drove to Leonetti's house.  (Bray June 10 Report at 4.)  They informed Leonetti of the allegations against him and requested he voluntarily go to their office to discuss the accusation, but Leonetti declined and asked for the detectives' names to give to his attorney.  (*Id.*)  Bray asked Leonetti to place his hands behind his back, Leonetti complied, and Shipley drove the three back to the sheriff's office.  (*Id.* at 5.)  Leonetti was read and acknowledged his *Miranda* rights, and declined to give a statement.  (*Id.*)

The detectives drove Leonetti back to his home and left a business card should Leonetti's

attorney have had any questions. (*Id.*) According to Leonetti, DHS contacted him later that day and required he move out of his house due to a perceived risk to his own children. (Kitchel Decl., Ex. 1 (Deposition of Joseph Leonetti ("Leonetti Dep.")) at 118–21.) Leonetti left home and stayed with his parents. (*Id.* at 120.)

III.    Charges are Filed and the Grand Jury Convenes.

The next day, Kiesel interviewed the two friends P.D. had named, both of whom confirmed being told about the abuse. (Kitchel Decl., Ex. 1 (June 18 Reports of Andy Kiesel ("Kiesel Reports")) at 29, 33.) One of the friends, L.D., explained that P.D. had told her P.D. also had noticed "white stuff . . . that came from [Leonetti]" on her sleeping bag, and that P.D. took the sleeping bag home the next morning and washed it. (Kiesel Reports at 233.)

Shortly thereafter, Kiesel informally mentioned his findings to Bray but did not author reports detailing the interviews until June 18, 2014, after Leonetti had been indicted. (Bray Dep. at 87–88; Kiesel Reports at 226, 231.) It does not appear the detectives attempted to corroborate this additional allegation or evidence of the sleeping bag until later in the investigation. (Kollias Dep. at 42.)

Young, Bray, and Kiesel reported the status of their investigation and the information gleaned therefrom to District Attorney Mike Regan ("Regan"). (Franz Decl. Ex. 111 (ECF No. 21–11) (Deposition of Mike Regan ("Regan Dep.")) at 8.) Regan, at the time the most experienced prosecutor in child sex abuse cases in the Clackamas County District Attorney's office, elected to take the case himself. (*Id.* at 5–6.) Based on the reports before him and conversations with Bray, Young, and Kiesel, Regan decided to charge Leonetti with four counts of sexual abuse. (Regan Dep.

at 8; Franz Decl., Ex. 101 ("District Attorney's Information") at 2–3.)  Regan testified he made the charging decision based on "ease of proof." (Regan Dep. at 9.)  Regan knew that P.D. "described multiple events, but she was unclear from the get-go as to how many." (*Id.*)  Based on his years of experience in the field, to Regan, the "numbers of times that victims are abused is one of the least consistent elements of any sex abuse case, and as a result, one of the least important, because victims don't think of their abuse in that way." (*Id.*)  Therefore, though P.D. had at least twice stated there were five instances of abuse, Regan aimed "to take the pressure off" P.D. by lessening the burden of production to only four instances. (*Id.*)

IV.    Leonetti's Indictment and Second Arrest.

Bray arrested Leonetti on June 12, 2013. (Kitchel Decl., Ex. 1 at 1.)  At booking , Bray filed and signed a document titled "Probable Cause for Lodging in Clackamas County Jail," based on "disclosure [of sexual abuse] made by the victim to detectives during an interview and later corroborated by friends she disclosed to." (*Id.*)  The next day, Regan filed an information in circuit court charging Leonetti with four counts of sexual abuse in the first degree, a Class B Felony in Oregon. (District Attorney's Information at 2–3.)  Leonetti was arraigned on June 13, 2013, and released five days later on his own recognizance. (Franz Decl., Ex.112 (ECF No. 21–12); Ex. 113 (ECF No. 21–13).)  As a condition of his release, the circuit court prohibited Leonetti from having contact with P.D. and her family, and any "minors but for supervised contact with minor family members." (Franz Decl., Ex.113.)

Both P.D. and Bray testified before a grand jury, which, on June 18, indicted Leonetti on all charges. (Regan Dep. at 9; Franz Decl., Ex. 102 (ECF No. 21–2) ("Indictment") at 2–3.)  Later that

day, a Clackamas County circuit court judge issued a warrant for Leonetti's arrest on the four counts. (Franz Decl., Ex. 103 (ECF No. 21–3).)

V.      Investigation Continues.

The following month, P.D. was evaluated at the Child Abuse Response and Evaluation Services ("CARES") Northwest center, located in the adjacent Multnomah County.  (Kitchel Decl., Ex. 1, Kollias Dep. at 148; Regan Dep. at 133.)  Ordinarily, a child from Clackamas County would have visited the Clackamas County Children's Center, but because Kollias's wife worked as a forensic interviewer at the Clackamas center, Clackamas County Children's Center staff decided the interview should be conducted at CARES to avoid any appearance of conflict.  (Kollias Dep. at 148–49.)

Bray also interviewed several other parents with children on the soccer team, and other members of the coaching staff.  (Bray Dep. at 89; Franz Decl., Ex 119 (ECF No. 40–4), at 3–4.)  The soccer club's coaching director informed Bray that in May 2013, another parent had filed a complaint against Leonetti with the team, alleging Leonetti had been a "little too touchy/ feely [sic]" with some of the girls on the team, "touching players on the backside" in a way that made the parent "uncomfortable."  (Franz Decl., Ex. 119 at 3, 6–7.)

Defendant CCSO Sergeant Clint Pierce ("Pierce") became head of the CCSO's Child Abuse Team in fall 2013.  (Declaration of Clint Pierce (ECF No. 19) at 2.)  In December 2014, Pierce learned P.D. had been attending therapy sessions and may have disclosed additional abuse during the sessions.  (Kitchel Decl., Ex. 1 at 36; and Pierce Dep. at 164.)  Bray and Shipley met with P.D.'s therapist, Leasia Cleary.  (Kitchel Decl., Ex. 1, at 38.)  P.D. had been seeing Cleary for almost one

year, and P.D. had discussed at least two specific instances of abuse with her.  (*Id.*)  P.D. also disclosed to Cleary that on one of the occasions, she had witnessed Leonetti masturbating but that she had not told anyone except for one friend, because she felt ashamed.  (*Id.* at 39.)  In Cleary's experience, it is common for victims of P.D.'s age to disclose elements of abuse in stages, particularly those like P.D., who was experiencing anxiety and depression at the time.  (*Id.*)  Cleary opined that P.D. demonstrated no "malicious motivation" to construct a false plot.  (*Id.*)  Rather, P.D. had "really loved" the Leonetti family and felt "devastated" about losing C.D. as a friend.  (*Id.* at 38–39.)

Bray and Shipley conducted another interview with P.D. in December 2014.  (Kitchel Decl. Ex. 1 at 44.)  P.D. told the detectives that on one occasion she had "felt the shaking and brushing of [Leonetti's shirt] leading her to believe he was masturbating."  (*Id.* at 45.)  P.D. stated she had mentioned these details to her friend V.D., but not L.D., who initially had told Kiesel about potential fluids on a sleeping bag.  (*Id.*; Kiesel Reports at 33.)

 After receiving discovery in the criminal case, Leonetti's criminal defense attorney, Janet Hoffman, requested production of the sleeping bag referenced in the L.D. interview.  (Declaration of Janet Hoffman ("Hoffman Decl.") (ECF No. 35), at 2.)  Bray and Shipley followed up with P.D. and her family, who confirmed that P.D. never brought her own sleeping bag to the Leonettis' home. (Franz Decl., Ex. 110 (ECF No. 21–10), at 12–17.)  P.D. did not know why or when a narrative about her taking home and cleaning a sleeping bag had emerged because she did not think she had disclosed specific details of the abuse to L.D.  (Kitchel Decl., Ex. 1, at 45.)  However, she maintained that Leonetti had "masturbat[ed] around her," clarifying that this occurred while she

pretended to be asleep under a blanket, not a sleeping bag.  (*Id*.)  Still, Hoffman considered this an inconsistency in P.D.'s allegations and raised the subject in a pre-trial motion hearing in December 2014.  (Hoffman Decl. at 2; Regan Dep. at 15.)  At the hearing, Kollias testified that the sleeping bag was of little concern to the detectives because it would have been expected that Leonetti's DNA would have been found on it, given its location in Leonetti's house.  (Kitchel Decl., Ex. 1, at 77.)

VI.    The Case is Dismissed.

The case went to trial in February 2015.  Hoffman intended to offer testimony from Holly Leonetti that P.D. had spent the night at their house only twice and that, contrary to P.D.'s allegations, Holly had been relatively well, not sick in bed, at the time of the alleged abuse, poking holes in P.D.'s account and arguing the CCSO and Clackamas County District Attorney's office suffered from conflicts of interest.  (Hoffman Decl. at 2; Regan Dep. at 16–17, 23.)

After opening arguments and following a meeting between Hoffman, Regan, P.D. and her family, and a victim's advocate, Regan asked P.D.'s family whether they wanted to proceed with the case.  (Regan Dep. at 20, 22; Hoffman Decl. at 2.)  Regan later testified he knew the case would be hard to win, given the absence of physical evidence, P.D.'s inconsistent references to timing and frequency, and the few corroborating witnesses.  (Regan Dep. at 16.)  In a separate meeting, Regan explained to P.D.'s family that Leonetti's attorney "would argue that those . . . inconsistencies . . . meant that she was a liar." (*Id*. at 23.)  The next morning, the family communicated to Regan and the presiding judge they wished to dismiss the case.  (Regan Dep. at 20, 22; Hoffman Decl. at 2.)

Regan told Bray about the dismissal in a February 6, 2015 email, explaining that "certain inconsistencies in [P.D.'s] account grew to a critical point," and that the family "reached a unified

decision that they did not want to go forward with the trial." (Kitchel Decl. Ex. 1, at 78.) The basis for the decision was "far too complicated to explain in an email," but Regan noted it "was probably a case [the department] should review in the future to grow and learn from." (*Id.*) Regan later testified his intention was to avoid the type of "alternative narrative" Hoffman was able to create by "seiz[ing] upon" inconsistencies typical in this type of "she said, he said" case. (*Id.* at 22–23.) Regan later stressed, however, that in his opinion, the "inconsistencies [] could be explained and did not mean that [the abuse] did not occur." (*Id.* at 23.)

VII.   The Civil Suit.

On March 6, 2015, Leonetti gave notice to the Defendants he intended to file a tort claim and, on December 2, 2015, filed the present suit in state court . (Franz Decl. Ex. 104; Notice of Removal (ECF No. 1), Ex. 2 ("Complaint").) He asserts state law claims for false arrest; malicious prosecution; and, on behalf of Holly Leonetti, loss of consortium; and a 42 U.S.C. § 1983 claim alleging violation of the First, Fourth, Fifth, and Fourteenth Amendments.[2] (Complaint at 1, 8–9.)

Defendants timely removed to this court, asserting federal question and supplemental subject matter jurisdiction. (Notice of Removal at 2.) They now move for summary judgment on all of Leonetti's claims. (Defs.' Mot. for Summ. J., (ECF No. 15) ("Motion").)

*Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is not

---

[2] Leonetti withdrew his Fifth Amendment claim at oral argument.

proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). When different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as

a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(internal quotation marks omitted).

*Discussion*

Defendants assert they are entitled to summary judgment on multiple, independently

sufficient grounds. First, they argue all of Leonetti's claims are time barred under applicable notice

requirements and statutes of limitations. Second, the individually named defendants assert they are

insulated from tort liability under principles of qualified and state-law immunity. Third, defendants

contend they are entitled to judgment as a matter of law on the merits because they acted with

probable cause sufficient under both federal and state law both to arrest and prosecute Leonetti. The

court addresses these arguments in turn.

I.       Tort Claim Notice and Statutes of Limitations.

Defendants assert that Leonetti's state false arrest and malicious prosecution, and his federal

§ 1983 claim are time barred: the state claims by the Oregon Tort Claims Act's ("OCTA's") notice

requirement and statute of limitation, and the federal claim by federal accrual rules, which

incorporate Oregon personal-injury law.

Under the OCTA, "[n]o action arising from any act or omission of a public body or an

officer, employee or agent of a public body within the scope of [the Act]" may "be maintained unless

notice of claim is given . . . within 180 days after the alleged loss or injury." OR. REV. STAT.

30.275(1)–(2)(b). This 180-day notice period begins to run when the plaintiff knows that he has

suffered some harm and knows that it is the result of tortious conduct, even if he does not know the

full extent of the harm or that those facts had legal significance.  *Dunn v. City of Milwaukie,* 270 Or. App. 478, 484 (2015).  Formal notice is sufficient under the OTCA if it contains a "statement that a claim for damages is or will be asserted against the public body . . . [and a] description of the time, place and circumstances giving rise to the claim . . . ."  OR. REV. STAT. § 30.275(4).

The OTCA also provides, "an action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of [the Act] shall be commenced within two years after the alleged loss or injury."  OR. REV. STAT. 30.275(9).  This two-year the statute of limitations begins to run when the plaintiff "knows or, in the exercise of reasonable care, should have known facts that would make a reasonable person aware of a substantial possibility that each of the elements of a claim exists."  *Smith v. Oregon Health Science University Hosp. and Clinic*, 272 Or. App. 473, 479 (2015) (citing *Doe v. Lake Oswego School District*, 353 Or. 321, 333 (2013)).

With respect to federal claims under § 1983, state personal-injury tort law determines the applicable statute of limitations.  *Owens v. Okure*, 488 U.S. 235, 249–50 (1989); *Trimble v. City of Santa Rosa*, 49 F.3d 583, 585 (9th Cir. 1995) (per curiam).  Oregon's statute of limitations for personal injury actions is also two years.  OR. REV. STAT. 12.110; *see Atwood v. Oregon Dept. of Transportation*, CV-06-1726-ST, 2008 WL 803020, at *2 (D. Or. Mar. 20, 2008) ("In Oregon, § 1983 claims are governed by the two year statute of limitations in ORS 12.110") (citing *Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir. 2002)).  But it is federal law that governs when a § 1983 cause of action accrues.  *Bagley v. CMC Real Estate Corp*., 923 F.2d 758, 760 (9th Cir.1991), *cert. denied*, 502 U.S. 1091 (1992).  Under federal law, a claim generally accrues when the plaintiff "knows or has reason to know of the injury which is the basis of the action."  *Id.* (quotation omitted).

The accrual date for a § 1983 claim therefore depends upon the substantive basis of the claim. *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998). A § 1983 claim for false arrest typically accrues when the arrest occurs. *Venegas v. Wagner*, 704 F.2d 1144, 1146 (9th Cir.1983) ("[W]here false arrest . . . is alleged, the conduct and asserted injury are discrete and complete upon occurrence, and the cause of action can reasonably be deemed to have accrued when the wrongful act occurs."). But a claim of malicious prosecution does not accrue until a defendant's acquittal or prosecution is terminated. *RK Ventures, Inc. v. City of Seattle,* 307 F.3d 1045, 1060 n.11 ("[A] claim of malicious prosecution does not accrue until the plaintiff is acquitted, because acquittal is an element of the claim.").

> A.    *False Arrest-Based Claims*.

Leonetti was first arrested on June 10, 2013, then again on June 12, 2013, after which he was held until his arraignment on June 18, 2013. Leonetti filed a tort notice on March 6, 2015, and his lawsuit on December 2, 2015. Construing the facts in the light most favorable to Leonetti, his state false arrest claim, and his § 1983 claim to the extent it rests upon his arrest, accrued at latest on June 18, 2013, when he was released from custody. By that time, Leonetti knew he had suffered some harm as the result of tortious conduct even if he did not know the full extent of the harm he now alleges. Therefore, Leonetti's notice of his state law false claim, filed more than 20 months after accrual, was untimely under the OTCA's 180-day notice period.

Moreover, on June 18, 2013, Leonetti knew of facts that would make a reasonable person aware of a substantial possibility that each of the elements of his false arrest claims existed, and he knew of the injury that founded the basis of that action. Under both Oregon and federal law, the

elements of a false arrest claim are that a defendant intentionally confined the plaintiff, that plaintiff is aware of the confinement, and the confinement is unsupported by probable cause. *Miller v. Columbia Cty.*, 282 Or. App. 348, 353–54 (2016), *review denied*, 361 Or. 238 (2017); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir.1998). By the time he was released following arraignment, Leonetti knew defendants had intentionally confined him, twice. He had seen the indictment that detailed the crimes of which he was accused. He also knew he believed he was innocent of the crimes charged and, therefore, that defendants necessarily lacked probable cause to confine him, that is, defendants had acted tortiously by arresting him. Accordingly, his state false arrest claim and, to the extent it rests on his arrest events, his § 1983 claim, both filed two years and five months after accrual, are respectively time-barred under the two-year statute of limitations imposed by the OTCA and Oregon's personal-injury law, ORS 12.110.

Leonetti argues his § 1983 claim falls under an exception to the general rule that a false arrest claim necessarily accrues at the time of the arrest, as articulated in *Cabrera*. Cabrera was arrested and prosecuted for disturbing the peace after he tried to break up a fight. *Cabrera*, 159 F.3d at 377. He was convicted but that conviction was later overturned. *Id.* He sued, alleging, *inter alia*, false arrest and malicious prosecution. *Id.* at 377–80. The district court dismissed his false arrest claim as untimely under the applicable statute of limitations, holding that the claims accrued not at the time of acquittal but at the time of Cabrera's initial arrest. *Id.* at 378. The Ninth Circuit reversed, however, holding that because a prior case, *Heck v. Humphrey*, 512 U.S. 477 (1994), protected criminal convictions from being invalidated by later civil findings, Cabrera could not have filed his civil claim before his conviction was overturned. *Id.* at 380. Therefore, his civil false arrest claim

accrued not at the time of the arrest but of the acquittal. *Id.* at 380 (citing *Heck*, 512 U.S. at 486–87 (1994)) ("[U]nder *Heck*, Cabrera's false arrest [claim was] not cognizable and did not accrue until his conviction was invalidated . . . .").

*Cabrera* made clear, however, that its holding is confined only to cases in which *Heck* applies, that is, if the plaintiff was actually convicted of the crime later challenged. The *Cabrera* court narrowed the exception, reminding that "[w]hile the facts of Cabrera's case fit it within *Heck*'s exception, other Ninth Circuit cases that express the general rule survive *Heck*, *see, e.g.*, *Venegas v. Wagner*, 704 F.2d 1144, 1146 (9th Cir.1983) (statute of limitations on a § 1983 false arrest claim accrues from the time of arrest)." *Id.* at n.7 (other internal citations omitted).

Leonetti, unlike Cabrera, was never convicted of the crimes of which he was accused. Therefore, neither *Heck* nor *Cabrera* applies. Rather, Leonetti's case fits squarely within the rule that his false arrest claim accrued, at the latest, when he was released from custody on June 18, 2013, following his second arrest.

With respect to his state law false arrest claim, Leonetti argues that the OTCA's notice period and statute of limitations did "not begin to run until discovery," and that the question of when that occurred is one for the jury, citing *Denucci v. Henningsen*, 248 Or. App. 59 (2012). (Pl.'s Resp. Br. at 14.) Denucci, a bystander with medical training, had stopped to help a boy who had been hit by a car when an officer arriving at the scene asked her to step back. *Denucci*, 248 Or. App. at 62. After an exchange with the officer, she took a step forward to ask for the officer's name, and she was arrested, she later learned, for interfering with a peace officer. *Id.* at 61–62. When initially she asked the arresting officer why she was being arrested, he replied only "You know why." *Id.* at 63.

PAGE 16 - FINDINGS AND RECOMMENDATION                                    [AHS]

The district attorney later dismissed the charge, and Denucci gave notice of suit — within 180 days of the dismissal, but not of her arrest. *Id.* The trial court did not dismiss for untimely notice, however, because the "discovery rule," applicable to both the OTCA's notice requirement and statute of limitations, required that the jury, not the judge, decide "what [the] plaintiff should have known and when," and that Denucci reasonably could not have discovered "everything she needed to know to start the clock running until less than 180 days before she filed her notice of claim." *Id.* at 66. The Oregon Court of Appeals affirmed, noting that "Defendant offers . . . no reason to conclude that a reasonable person would have known that her arrest was unlawful on the day when it took place." *Id.* at 69. As such, "questions of fact precluded the court from deciding the issue as a matter of law." *Id.* at 67, 69–70.

Leonetti asserts that, under *Denucci*, the notice period and statute of limitations on his false arrest claim did not begin to run until he discovered some of the alleged problems with defendants' probable cause, namely until December 2014, when detectives confirmed there was no sleeping bag with potential physical evidence. This argument fails because *Denucci*, like *Cabrera*, is factually distinct from this case. Unlike Denucci, Leonetti had ample reason to know for what and on what bases he was being arrested. Bray reported, and Leonetti's testimony later confirmed, that Bray and Shipley expressly told Leonetti of the allegations against him in the opening moment of their visit to his house. (Kitchel Decl., Ex. 1, at 24; 117:7–9; 118:4–15.) That Leonetti later learned neither a sleeping bag nor physical evidence was found has no bearing on what Leonetti knew at the time of his arrest and, thus, on when his false arrest claim accrued. Moreover, that evidence, or rather the lack thereof , was known or should have been known to him from the onset. As early as December 2013, Leonetti stated that when P.D. spent the night at the Leonettis' house, the two girls

slept in sleeping bags.  (Franz Decl., Ex. 115 (ECF No. 15-15), at 2.)  He later testified he believed those sleeping bags belonged to the Leonettis. (Franz Decl., Ex. 114 (ECF No. 15-14), at 3.)  Therefore, Leonetti had all the facts necessary to know whether there was physical evidence on the sleeping bag in question and where that sleeping bag was located during the investigation.

Thus, none of the factual questions present in *Denucci* and which called into question the point at which the notice period and statute of limitations began to run are present here.  Leonetti's contention is correct that he had no way of knowing all and the exact bases of the defendant's probable cause to arrest and prosecute him until well into the discovery period, but under *Dunn* and *Smith* that fact is not relevant here:   the OTCA requires only that Leonetti knew he had suffered some harm and that harm was the result of tortious conduct, even if he did not know the full extent of the harm or that those facts had legal significance.  *Dunn,* 270 Or. App. at 484 (2015) (interpreting ORS 30.275(4)); *Smith,* 272 Or. App. at 479 (interpreting ORS 30.275(9)).

Therefore, both Leonetti's state false arrest claim and § 1983 claim to the extent it relies on the arrests are time barred.

### B.    *Malicious Prosecution-Based Claims.*

Leonetti's malicious prosecution-based claims, however, remain timely.  Under Oregon law, the notice period and statute of limitations period for a malicious prosecution claim begins to run and, under federal law, accrues, on the date when criminal proceedings terminate in the plaintiff's favor.  *Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174, 1191 (D. Or. 2011), *aff'd*, 496 F. App'x 728 (9th Cir. 2012) (citing *Edwards v. State ex rel. Dep't of Human Res. Children Adult and Families Div.*, 217 Or. App. 188, 198 n.2 (2007)) ("Oregon courts []have held claims for malicious prosecution under Oregon law do not accrue until 'the criminal proceedings terminate in plaintiff's

favor.'"); *Davidson v. Deschutes Cty.*, No. 6:15 CV 52-TC, 2015 WL 4464145, at *3 (D. Or. July 21, 2015) ("Plaintiff's [§ 1983] claim for malicious prosecution accrued when the prosecution was terminated.").

The criminal proceeding against Leonetti terminated when the state dismissed its case against him on February 6, 2015, at which point the notice period and statute of limitations on a malicious prosecution claim began to run. Leonetti gave notice of his suit one month later on March 6, 2015, in compliance with Oregon's 180-day notice period. He filed the present suit on December 2, 2015, well within the two-year window imposed on his state claim by ORS 30.275 and on his §1983 claim by ORS 12.110. Thus, his state malicious prosecution claim and his §1983 claim, to the extent it rests on constitutional violations arising from his prosecution, are timely.

## II.    Probable Cause.

Even if Leonetti's false arrest-based claims were timely, they, like Leonetti's malicious-prosecution-based claims, fail on substance because Defendants at all relevant times acted with probable cause.

Leonetti was charged under ORS 163.427, which criminalizes "sexual contact" with a "victim [] less than 14 years of age." Defendants assert two independently sufficient bases to support probable cause that Leonetti committed this crime: (1) the content of P.D.'s initial statement to Detectives Bray and Shipley; and (2) the grand jury indictment and arrest warrant signed by a judge. Leonetti challenges both these grounds, arguing that P.D.'s testimony was neither sufficiently trustworthy nor reliable to support probable cause and that an indictment is only some evidence of probable cause that can be rebutted by other evidence, including false testimony or other wrongful conduct. Leonetti further contends that even if officers had probable cause to arrest or indict

Leonetti on one charge, they lacked probable cause required to support all of the charges.

Under federal law, probable cause exists "where the facts and circumstances within . . . officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (internal alterations and quotation marks omitted). Whether officers act with probable cause "depends on the totality of the facts available to the officers, who may not disregard facts tending to dissipate probable cause." *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016) (internal quotation omitted). Probable cause does not require "certainty or even preponderance of the evidence," but officers must be able to conclude there is a "fair probability" the individual committed a crime. *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006). "Conclusive evidence of guilt is not necessary to establish probable cause" to seize an individual. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009). But "mere suspicion, common rumor, or even strong reason to suspect" that a plaintiff has engaged in criminal behavior are not enough to establish probable cause. *Id.* (citations omitted).

Oregon employs a probable cause standard substantially similar, but not identical, to the federal standard. *See Gustafson v. Payless Drug Stores Nw., Inc.*, 269 Or. 354, 356 (1974) (explaining probable cause exists when an officer "reasonably believes that the person accused has acted . . . in a particular manner, and []correctly believes that such acts . . . constitute at common law or under an existing statute the offense charged . . ."); *see also State v. Stoudamire*, 198 Or. App. 399, 405 (2005) (Armstrong, J., concurring) (rejecting government defendants' syllogism that "Oregon constitutional law on probable cause . . . is at least as protective as federal constitutional

law," reminding of courts' obligation to "make an independent assessment" of each).

Defendants argue they acted with probable cause at each point relevant to Leonetti's claims: the June 10, 2013 arrest, the June 12, 2013 arrest, Leonetti's warrant issuance and indictment, and the subsequent prosecution. The court analyzes each of the four events below.

A.     *June 10, 2013 Arrest.*

When Bray and Shipley first arrested Leonetti, they knew only of P.D.'s parents' account of her disclosure and statements P.D. made during the first interview with the detectives. Still, those facts alone were likely independently sufficient to support probable cause to arrest Leonetti.

Defendants first rely on *Ohio v. Clark*, 135 S. Ct. 2173 (2015), to argue that a statement from a child victim as young as three is sufficient to support probable cause that abuse occurred. That reliance ignores, however, that the statement in *Clark* came only after the boy's teacher's noticed pronounced injuries on the toddler's body. *Id*. at 2178. Thus, the boy's statement was corroborated strongly by physical evidence, rendering *Clark* factually inapposite to the situation here.

Several other cases, however, are more instructive. Though the Ninth Circuit has held that "uncorroborated, inconsistent statements of [a] very young child" are insufficient to establish probable cause, it has also suggested and affirmed that such statements, when coupled with other evidence, can be enough. *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009); *accord. Guerrero v. City & Cty. of San Francisco*, No. C00-1247 THE, 2003 WL 22749099, at *1 (N.D. Cal. Nov. 18, 2003), *aff'd*, 156 F. App'x 36 (9th Cir. 2005). In *Stoot*, officers relied on a four-year-old girl's statement describing sexual abuse by a teenage boy to hold and interrogate the teen until he confessed. *Stoot*, 582 F.3d at 913–16. The child confirmed specific acts occurred in response to pointed questions, but "by the end of the interview" she had "reversed herself" as to whether the

abuse had occurred at all and what exactly happened. *Id.* at 920. The trial court found probable cause existed based on the child's statements; statements from the girl's mother; and the teen's confession, made without counsel present. *Id.* at 916. But when that confession was later deemed inadmissible, the Ninth Circuit held that the statements from the child and her mother alone were insufficient to establish probable cause, noting the child's "very young" age and the inconsistencies in her account, including that at one point, she had confused the teenager accused with another boy. *Id.* at 919–20. These factors "point[ed] to the need for further investigation and corroboration to establish probable cause." *Id.* at 920.

In so holding, the *Stoot* court distinguished that case from *Easton v. City of Boulder*, 776 F.2d 1441 (10th Cir.1985). There, a three-year-old boy told his parents Easton had molested him. *Id.* at 1443–46. A five-year old boy who witnessed the abuse corroborated the boy's account. *Id.* at 1443. Police also visited the alleged crime scene, which was found to match both boys' accounts, and interviewed Easton's manager, who described him as a loner who was "observed in the past staring at the children playing in the common area of the apartment complex." *Id.* at 1443–44 (internal quotation marks omitted). The Tenth Circuit upheld a probable cause determination based in large part on the children's statements, noting that "[i]n a great many child molestation cases, the only available evidence that a crime has been committed is the testimony of children" and "[t]o discount such testimony from the outset would only serve to discourage children and parents from reporting molestation incidents and to unjustly insulate the perpetrator of such crimes from prosecution." *Id.* at 1449. The court was also lenient toward "apparent inconsistencies" in the statements, reasoning, "the skepticism and careful scrutiny usually found in cases involving informants, . . . is appropriately relaxed [when examining informant evidence used to support a claim of probable cause] if the

informant is an identified victim . . . ." *Id.* at 1450.  Though certain statements of the child victim were self contradictory, those inconsistencies "[did] nothing to undermine the solid core of the children's statements regarding [one instance of assault] and the location of the perpetrator's apartment." *Id.* at 1450.  Thus, as the *Stoot* court later distinguished, the police in *Easton* "had substantial evidence corroborating the victim's statements of alleged abuse, rendering the officers' reliance on those statements reasonable.  *Stoot*, 582 F.3d at 921.

Both the Ninth Circuit and the Oregon Court of Appeals have also affirmed a finding of probable caused based on even less.  In *Guerrero*, a father reported to police that his six-year-old daughter had been sexually abused by her mother's boyfriend.  *Guerrero*, 2003 WL 22749099, at *1, *aff'd*, 156 F. App'x 36 (9th Cir. 2005). The girl revealed the abuse to her counselor, and later to both a city investigator and a nurse at a children's sexual abuse resource center.  *Id.* at *2.  A magistrate judge issued an arrest warrant based on the police incident reports, the counselor's report, and one investigator's questionable summary statement, which was later deemed inadmissible.  *Id.* at *3.  The prosecutor later dismissed the case one day into trial after the girl admitted to fabricating the story at her father's demand, and the defendant-turned-plaintiff sued for civil rights violations.  *Id.* at *4.  Still, the district court was "not convinced that a magistrate would have declined to find probable cause to arrest for lewd and lascivious conduct given the[] consistent statements of molestation to a counselor and a police officer," particularly given the resource center interview, which had not even been attached to the warrant application.  *Id.* at *8.  *See also State v. Mace*, 67 Or. App. 753, 760 (1984) (affirming that probable cause existed to support a warrantless arrest based only on a four-year-old child's disclosure of sexual abuse to her mother).

Although the facts here fall somewhere between these comparators, they support probable

cause.  At thirteen, P.D. was older than the child victims in *Stoot*, *Easton*, *Guerrero,* and *Mace* at

the time of her initial disclosure to her mother.  From the outset of her first interview with detectives,

P.D. struck them as communicative and forthcoming.  That interview, like that in *Easton*, contained

some inconsistencies, specifically concerning the dates and frequency of the abuse, and later, the

specific sex acts performed.  But at least twice, P.D. recounted five instances of abuse.  Additionally,

to both Regan and Cleary, the nature of the inconsistencies in P.D.'s account were not uncommon

in cases of this sort.  (*See* Regan Dep. at 9 ("It's [] my experience . . . that numbers of times that

victims are abused is one of the least consistent elements of any sex abuse case, and as a result, one

of the least important, because victims don't think of their abuse in that way); Kitchel Decl. Ex. 1,

Transcript of Leasia Cleary Interview, at 41 ("remembering [] in pieces . . . fits with what I know

about trauma . . . .").)  Moreover, whether Leonetti also masturbated in P.D.'s presence was

immaterial to the crime of which Leonetti was suspected, ORS 163.427, which requires only sexual

contact generally.  Most importantly, as in *Stoot*, these inconsistencies did not undermine the "solid

core" of P.D.'s statements regarding the conduct she described.  Finally, unlike the child in *Easton*,

P.D. never wavered as to the identify of her abuser.  And , unlike in *Mace*, where officers had only

a mother's account of what her child had told her about the abuse, here, the disclosure came directly

from P.D., the victim.  Based on those facts, Bray and Shipley would have been able to conclude

there was a fair probability Leonetti had committed the crimes P.D. alleged.

     *B.      June 12, 2013 Arrest.*

     Defendants had more facts to support probable cause by the time Leonetti was arrested for

the second time.  Like in *Easton,* Defendants here did not rely on P.D.'s statements alone.   Under

the Ninth Circuit's reasoning in *Stoot*, even if initial, inconsistent statements pointed to a need for

further investigation and corroboration to establish probable cause, the detectives conducted that further investigation before arresting Leonetti again on June 12, 2013.   While Bray and Shipley interviewed P.D. on June 10, Kiesel simultaneously interviewed V.D. and, the following day, L.D. Both friends confirmed that P.D. had made similar disclosures them about the abuse.   That P.D. made these disclosures contemporaneously, close to the period of the abuse, increases this corroboration's probative value.   Though based on the record, it does not appear Bray and Shipley knew about Kiesel's interviews when they first arrested Leonetti on June 10, the investigation team appears to have been aprised of the results of Kiesel's interviews by the time the June 12 arrest occurred.   Thus, even if P.D.'s disclosure to her mother and initial statement to detectives were insufficient to support probable cause, by the time of Leonetti's second arrest, defendants had more than enough facts to warrant a person of reasonable caution to believe that Leonetti had committed the crimes alleged.

       C.     *Warrant and Indictment.*

Even if doubt persisted as to probable cause on the facts alone, Defendants' second basis put forth to support probable cause — the grand jury indictment and arrest warrant — independently supports a presumption of probable cause, one Leonetti now must rebut.

Under both federal and Oregon state law, grand jury indictment constitutes *prima facie* evidence of probable cause. *Libby v. City of Medford*, No. 1:15-CV-00298-CL, 2017 WL 2219995, at *5 (D. Or. Mar. 17, 2017), report and recommendation adopted, No. 1:15-CV-00298-CL, 2017 WL 2219980 (D. Or. May 19, 2017) *(*citing among other cases, *Awabdy*, 368 F.3d at 1067); *Hryciuk v. Robinson*, 213 Or. 542, 551 (1958); *Shoemaker v. Selnes*, 220 Or. 573, 581(1960). The Supreme Court has made clear that "an indictment, 'fair upon its face,' and returned by a 'properly constituted

grand jury,' conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry." *Gerstein v. Pugh*, 420 U.S. 103, 117, n.19 (1975); *see also Kaley v. United States*, 134 S. Ct. 1090, 1098 (2014) ("The grand jury gets to say — without any review, oversight, or second-guessing — whether probable cause exists to think that a person committed a crime.").  To rebut this presumption, a plaintiff must "overcome" the evidence with "proof that the [indictment or warrant] was obtained by false testimony or other improper means." *Awabdy*, 368 F.3d at 1067 (stating a plaintiff can overcome a finding of probable cause based on a grand jury indictment "by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith"); *Hryciuk*, 213 Or. at 551 (1958) ("the duty devolves upon the plaintiff to prove that such action was obtained by false testimony or other improper means.").

A circuit court judge issued a warrant for Leonetti's arrest on all four counts of sexual abuse in the first degree.  The grand jury returned an indictment against Leonetti on all four counts.  These two instruments provided *prima facie* evidence of probable cause that Leonetti now must rebut.

Leonetti fails to do so, as he submits no evidence that creates a genuine issue of material fact that any of the charges in either the indictment or the warrant were obtained by false testimony or other improper means.   Nothing in the record suggests any defendant presented false information to the grand jury or judge, nor does Leonetti allege as much.  Rather, Leonetti offers three general arguments to challenge the probable cause presumption.  First, he offers Regan's deposition testimony opining the case was — in Leonetti's attorney's words, not Regan's — "unwinnable."

(Pl.'s Resp. Br. at 18.)[3]  Leonetti then extends his attorney's characterization to infer that "[i]f a case is 'unwinnable,' there is no probable cause."  But that a case may be difficult to try or win does not mean investigators and prosecutors lack probable cause to prosecute the case.  And such evidence hardly supports a showing of the bad faith required to rebut a presumption of probable cause created by an arrest warrant signed by neutral judge and an indictment.

Second, Leonetti alludes to conflicts of interest at the CCSO, but fails to present evidence that these potential conflicts created structural unfairness or specific instances of bias with a potential to compromise the investigation.

Third, Leonetti does not argue that Bray lied to the grand jury, but he implies that because "the CCSO never followed up to get the sleeping bag, and yet revealed only late in the game to Leonetti's counsel that no such sleeping bag existed," Bray is liable for failing initially to notify Regan about the sleeping bag or, rather, lack thereof.  This, Leonetti argues, was an "exonerating fact."  (Pl.'s Resp. Br. at 8–9, 18.)

That argument misconstrues and confuses both the facts and the law.  First, though Leonetti infers Bray never told Regan about the potential existence of the sleeping bag prior to charging, the record suggests otherwise.  Though Keisel authored his interview reports only after Leonetti was charged, Keisel orally told Bray about his interview with L.D. "pretty quick[ly]" after the interview,

---

[3] Regan stated during his deposition:

> I told [P.D. and her family] after hearing the strategy of the defense for the first time that I didn't think we could overcome the reasonable doubt that was going to exist because of the arguments that were being put forward and it was basically a she said he said case. And those cases are always tough, and in this case it became much tougher.

(Regan Dep. at 21.)

and Regan testified he made the charging decision based on both submitted reports and conversations with Bray, Young, and Keisel. (Bray Dep. at 37; Regan Dep. at 8.) The record therefore suggests Regan did know about the possibility of physical evidence on a sleeping bag, if not from Bray, then directly from Kiesel, when he prepared his district attorney's information and submitted the case to the grand jury.

Second, that no sleeping bag with physical evidence was found is not an exonerating fact. An absence of one piece of incriminating evidence does not equate to the existence of exculpatory evidence. If the sleeping bag has any relevance, it represents an area of consistency in P.D.'s account of the abuse. P.D. stated in her initial interview that when she spent the night at the Leonettis', she slept in a sleeping bag. P.D.'s friend, L.D., then stated that P.D. had also told her Leonetti masturbated on a sleeping bag and added, apparently erroneously, that P.D. had subsequently taken it home to clean. Based on the record, it appears Defendants chose initially not to pursue that lead. This could have been due to any number of reasons, for example, Kiesel may have, apparently rightly, found that portion of L.D.'s account non-probative or, as Kollias testified, of little import to the investigation, since they would have expected to find Leonetti's DNA on a sleeping bag at his house regardless of whether abuse in fact occurred. However, when, months later, P.D.'s disclosure of masturbation allegations were corroborated by Cleary, defendants followed up. At that point, P.D. clarified, and her parents confirmed, that the girls slept in sleeping bags found in the Leonettis' closet and that none of those linens were ever brought to or cleaned at P.D.'s house. This account is consistent with Leonetti's testimony as well. Thus, not only was Defendants' investigation of the sleeping bag narrative sound, the findings of that investigation were consistent with P.D.'s original account of the abuse.

Third, even if Defendants' investigatory tactics with respect to the sleeping bag were in any way questionable, Leonetti cannot retroactively challenge those tactics as a means to rebut probable cause, especially probable cause determined by a grand jury and neutral judge. The Supreme Court has made clear that officers have no obligation to perform any "particular investigatory tool." *Arizona v. Youngblood*, 488 U.S. 51, 58–59 (1988). To illustrate, "a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests." *Id.* at 59. Indeed, the Ninth Circuit has stated "[o]nce probable cause is established, 'an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused.'" *Cameron v. Craig*, 713 F.3d 1012, 1019 (9th Cir. 2013) (quoting *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003).) Accordingly, Leonetti fails to rebut the *prima facie* evidence of probable cause created by the indictment and the arrest warrant.

D.      *Prosecution.*

Leonetti contends that the probable cause standard required to support prosecution is a narrower, and thus higher, than that required to support an initial arrest. Several circuits have articulated and employed a different, narrower standard of probable cause when analyzing malicious prosecution claims. *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 682–85 (7th Cir. 2007) (citing *Johnson v. Knorr*, 477 F.3d 75, 83–85 (3d Cir. 2007); *Uboh v. Reno*, 141 F.3d 1000, 1005 (11th Cir.1998); *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991); *Rivera–Marcano v. Normeat Royal Dane Quality A/S*, 998 F.2d 34, 38 (1st Cir. 1993). The Seventh Circuit in *Holmes,* held that "probable cause to believe an individual committed one crime . . . does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge." *Id.* at 682. The

court explained, "[i]n this respect, a malicious prosecution claim is treated differently from one for false arrest: whereas probable cause to believe that a person has committed any crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." *Id.*

The Ninth Circuit does not appear yet to have addressed this question, but it has noted, at least within the context of collateral estoppel, that a probable cause determination at a preliminary hearing is not necessarily dispositive of a subsequent malicious prosecution claim because "probable cause to continue a prosecution may disappear with the discovery of new exculpatory evidence after the preliminary hearing." *Haupt v. Dillard*, 17 F.3d 285, 290 n.5 (9th Cir. 1994), as amended (Apr. 15, 1994). "In such a case, state actors who are made aware of this evidence but then suppress it may be liable for malicious prosecution under § 1983. *Id.* (citing *Weg v. Macchiarola*, 995 F.2d 15, 17–18 (2nd Cir. 1993); *see also Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009) (analyzing separately the probable cause sufficient to support an arrest and that to support prosecution).

Other similarly postured cases since, however, have received uniform probable cause analyses. *See e.g.*, *Puccetti v. Spencer*, 476 F. App'x 658, 660 (9th Cir. 2011) (employing the same probable cause standard for both inquiries, holding that officers' probable cause to arrest served as a "complete defense" to plaintiffs' malicious prosecution claim); *see also Radocchia v. City of Los Angeles*, 479 F. App'x 44, 45 (9th Cir. 2012) (holding plaintiff's "claim for malicious prosecution, [was] barred by the finding that there was probable cause for his arrest"). Even so, the Ninth Circuit has affirmed the denial of one plaintiff's *Haupt* challenge when he failed to show "any discovery of new or even exculpatory evidence after the preliminary hearing, any attempt by the prosecution to

suppress the evidence, or any other wrongful conduct by the prosecution in the Criminal Case." *Pierson v. Storey Cty.*, No. 3:12-CV-00598-MMD, 2015 WL 995124, at *5 (D. Nev. Mar. 5, 2015), *aff'd sub nom.* 682 F. App'x 577 (9th Cir. 2017). The court finds the Seventh Circuit's approach in *Holmes* convincing and consistent with the Ninth Circuit's reasoning in *Haupt*.

Additionally, a similar inquiry is warranted under Oregon law. The Oregon Supreme Court has recognized that even if probable cause exists for an arrest, "it might not exist later, during prosecution," noting that if "[u]pon additional facts coming to the knowledge of the defendants after the arrest, probable cause to prosecute could evaporate entirely." *Ira v. Columbia Food Co.*, 226 Or. 566, 571–72 (1961).

As such, this court analyzes Defendants' actions here also under a stricter probable cause standard that requires not only that defendants had probable cause initially to arrest Leonetti, but also later to prosecute him for each of the four counts of sexual abuse with which he was charged. This inquiry includes consideration not only of the evidence giving rise to the probable cause to arrest Leonetti but, under *Haupt* and *Ira*, of later discoveries that may have eroded probable cause to continue the prosecution.

Even under this more exacting standard, Defendants maintained probable cause sufficient to warrant continuing Leonetti's prosecution. Once charges were filed and the indictment was returned, Defendants gathered additional facts to support probable cause. They collected and relied on statements P.D. made to a trained forensic nurse. When Sergeant Pierce learned P.D. had been seeing a counselor, detectives interviewed Cleary. Under *Guerrero*, additional disclosures like these strongly support probable cause. When Cleary's account corroborated the masturbation allegation, detectives followed up with P.D. and her family. Detectives conducted a second interview with P.D.,

in which the core of her account remained consistent.  Detectives also interviewed parents of other children on the soccer team and other members of the soccer team coaching staff, which revealed at least one other allegation of similar misconduct by Leonetti made before P.D.'s allegations were made to the Defendants.  The CCSO detectives never visited the Leonetti house, the alleged crime scene, nor questioned Holly Leonetti about the allegations, but these alleged failings that Leonetti relies upon are not material:  the location of the abuse was never disputed and Bray testified that based on Leonetti's refusal to speak to the detectives without his lawyer, he believed he could contact the Leonettis only through Leonetti's criminal defense attorney.

Thus, Leonetti fails to show any discovery of new or exculpatory evidence, any attempt by Defendants to suppress the evidence, or any other wrongful conduct that might suggest the erosion of probable cause against him.  To the contrary, the additional facts gathered by Defendants were sufficient to warrant Defendants' continued belief that Leonetti had committed the crimes charged. Rather than dissipate, as the investigation progressed, probable cause grew more robust.

III.    Federal Claim.

    A.    Constitutional Violations.

42 U.S.C. § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3(1979) (internal quotation omitted)). Leonetti brings suit under§ 1983, alleging Defendants' actions deprived him of his constitutional rights under the First, Fourth, and Fourteenth Amendments.

    Addressing Leonetti's Fourth Amendment argument first, the Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures," U.S.

CONST. amend. IV.  A "seizure" is a restraint on personal movement such that a person is not free to leave, typically an arrest event or pre-charge detention.  *Brendlin v. California*, 551 U.S. 249, 254 (2007).  With some exceptions, none of which are relevant here, a Fourth Amendment seizure is "reasonable" only if based on probable cause.  *Bailey v. United States*, 568 U.S. 186, 192 (2013).

As outlined *supra* in Part I.A, the portions of Leonetti's § 1983 claim that derive from his June 2013 arrest events are time barred.  Even if they were timely, because, as discussed in Parts II.A–B, the court concludes Defendants acted with probable cause, the Fourth Amendment seizures represented by both his arrests were reasonable, and therefore, constitutional.

With respect to the timely portions of Leonetti's § 1983 claim, those that occurred after Leonetti was released from custody following his arraignment, the Fourth Amendment likely does not apply.  Because he was released on his own recognizance, it does not appear, and Leonetti does not allege, that he was seized under the meaning of the Fourth Amendment at any time following his two arrests.

The law remains somewhat unsettled as to whether malicious prosecution alone, absent any discrete Fourth Amendment seizure, implicates the Fourth Amendment.  *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917 (2017) (holding plaintiff could maintain a § 1983 claim under the Fourth Amendment despite time-barred false arrest claims, but premising that holding on fact plaintiff had been detained, and thus seized, pretrial); *Albright v. Oliver*, 510 U.S. 266, 274 (1994) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."); *Gerstein,* 420 U.S. at 114 (holding Fourth Amendment requires a judicial determination of probable cause as a prerequisite to any extended restraint on liberty following an arrest); *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002) (holding "Fourth Amendment principles,

and not those of due process" governed case involving false arrest and malicious prosecution, with no mention of whether plaintiff had been detained pre-trial).

Here, regardless of whether the Fourth Amendment is implicated by malicious prosecution without pre-trial detention, again, no Fourth Amendment violation occurred because Defendants at all relevant times acted with probable cause.

Leonetti also claims Defendants violated his First, Ninth, and Fourteenth Amendment rights. Based on his response brief, this argument derives at least in part from *Doe v. Irwin*, 441 F. Supp. 1247 (D. Mich. 1985), *rev'd*, 615 F.2d 1162 (6th Cir. 1980). Leonetti cites *Irwin* for its suggestion that the "rights of parents to the care, custody and nurture of their children is of such character that it cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions[,]" and that such rights are "fundamental rights protected by the First, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution." *Id*. at 1251.

Leonetti's reliance on *Irwin* is misplaced for two reasons. For one, *Irwin* arose when parents sought to stop county health services from providing contraceptives to their teenage children. *Id*. at 1248. Thus, it is factually and contextually distinct from the instant case. And second, even if the case were applicable, the parents' rights there were not so fundamental as the trial court suggested: The Sixth Circuit subsequently reversed the initial injunction and held the health providers' practices to be constitutional. *Doe v. Irwin*, 615 F.2d 1162, 1169 (6th Cir. 1980).

Leonetti also argues his constitutional rights "to earn a living at his chosen profession as a soccer coach," "to family integrity and to be able to live with his wife and children . . ." were violated. (Pl.'s Resp. Br. at 19.) These arguments appear based on the prohibition during the

investigation and prosecution of Leonetti having contact with minors, including his own minor children.

None of the cases Leonetti puts forth in support of this argument are analogous or even implicate the constitutional provisions at issue in this case. He cites generally *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274 (1985), *Frazier v. Heeve*, 482 U.S. 641 (1987), and *Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264 (4th Cir. 1993). But Leonetti provides no pincites, and it is unclear how, if at all, these cases support his position. *Piper* and *Frazier* both involved the right for a non-resident to practice law in a neighboring state (*Piper*, 470 U.S. at 277–78, *Frazier,* 482 U.S. at 642–43); and *Tangier* involved a challenge to a state-imposed fee for non-resident fishermen. *Tangier Sound*, 4 F.3d at 265–66. *Piper* and *Tangier Sound* turned on the Privileges and Immunities Clause of Article IV of the Constitution, not any of the amendments at issue here. *Piper*, 470 U.S. at 279; *Tangier Sound*, 4 F.3d at 266. Though *Frazier* arose from a challenge under numerous constitutional provisions, the Court did not address any of the constitutional challenges, instead deciding the issue on other grounds, *Frazier*, 482 U.S. at 646–50. Leonetti also cites *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) for its proclamation that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." But *Santosky* arose in a vastly different context — the state's right to terminate parental rights amid accusations of parental neglect, *Santosky,* 455 U.S. at 747 — and therefore holds little relevance here.

Though Leonetti characterizes his pretrial restriction as an almost complete ban on his familial association, his conditional release order granted Leonetti a specific exception permitting "supervised contact with minor family members." (Franz Decl., Ex. 113.) Leonetti testified that

his "protective order was to not be alone with minors including [his] children, or spend the night in [his] house. [He] could be at [his] house with an adult."  (Leonetti Dep. at 121.)  Holly Leonetti stated the family was ordered "to have two chaperones, not just [her], for a while," but did not specify from where or whom that order came.  (Kitchel Decl., Ex. 1, Deposition of Holly Leonetti, at 104.)

Even assuming the Leonettis' accounts of these additional restrictions are true, Leonetti's opportunities to pursue his livelihood as a youth soccer coach and to associate with his minor children were affected only collaterally by those conditions.  Such conditions do not rise to a constitutional violation.  *See United States v. Wolf Child*, 699 F.3d 1082, 1092 (9th Cir. 2012) (noting,"[t]he existence of a constitutionally protected liberty interest . . . does not render impermissible any condition that would interfere with the parent-child relationship.")  A parent's fundamental right to familial association "is not absolute" and "must be balanced against the interests of the state, and when conflicting, against the interests of the children." *Kruse v. Hawai'i*, 68 F.3d 331, 336 (9th Cir.1995) (citing *Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir.1991) and *Woodrum v. Woodward County*, 866 F.2d 1121, 1125 (9th Cir.1989).)  Reported child abuse, in particular, "raise[s] a valid governmental interest sufficient" to warrant even significant interference with familial relationships. *Woodrum*, 866 F.2d at 1125 (upholding removal of children from home after report of child abuse).

Leonetti also argues "[b]eing subjected to malicious prosecution deprived [] Leonetti of his constitutional rights under the 14th Amendment." (Pl.'s Resp. Br. at 20.)  He cites *Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004), arguing the case establishes that the Fourteenth Amendment is a proper basis for a § 1983 action and that "the rights asserted can be freedom of

assembly, freedom of association, freedom of speech, or the right to pursue an occupation." (*Id.*) This case does not help his position.

Awabdy served on the City Council and often took positions critical to other municipal officials. *Awabdy*, 368 F.3d at 1065. Disgruntled councilmembers made false allegations about Awabdy, noting his "Arabic extraction," and, two weeks before council elections, county prosecutors charged Awabdy with embezzlement of public funds. *Id.* Awabdy lost reelection, and prosecutors subsequently dropped the embezzlement charges. *Id.* at 1066. Awabdy sued, asserting malicious prosecution under § 1983. *Id.* The Ninth Circuit reversed the lower court's dismissal of Awabdy's case, clarifying that although there exists "no substantive due process right [] under the Fourteenth Amendment to be free from prosecution without probable cause[,]" malicious prosecution can be brought under § 1983 when a plaintiff can prove, in addition to the elements of malicious prosecution, that "the defendants acted with the purpose of depriving him of a 'specific constitutional right,'" such as the "freedom of assembly, []freedom of association, [] freedom of speech, and [] the right to pursue an occupation." *Id.* at 1069.

In Awabdy's case, the facts supported that defendants had conspired to deprive Awabdy of both his First Amendment rights by using the charge in an attempt to silence his political campaign and his right to equal protection because they were motivated by racial animus. *Id.* at 1069–70. As such, Awabdy could support a § 1983 claim for malicious prosecution, by also alleging violations of the First and Fourteenth Amendments. *Id.*

In Leonetti's case, however, the facts support no such claim. Leonetti does not allege he is a member of any protected class and, based on the record, it does not appear Defendants acted with the purpose of denying him any political or religious freedom. As addressed above, the condition

prohibiting contact with minors does not rise to a free speech or association violation. Because no specific constitutional right has been violated, Leonetti cannot rely solely on alleged malicious prosecution to sustain his § 1983 claim. *See also Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995), *as amended on denial of reh'g and reh'g en banc* (Dec. 29, 1995) ("Malicious prosecution, by itself, does not constitute a due process violation . . . .")

Leonetti also offers four other cases to argue malicious prosecution alone can amount to a constitutional violation, but again, none are apt. Two are irrelevant. *See Lee v. Mihalich*, 847 F.2d 66 (3rd. Cir. 1988) (including no mention of Fourteenth Amendment and later abrogated on that very ground in *Donahue v. Gavin*, 280 F.3d 371 (3d Cir. 2002); *N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1563 (11th Cir. 1990) (declining to address plaintiff's Fourteenth Amendment argument). And two are inapposite. In the first, *Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987), the Ninth Circuit held that "contrived charges, . . . false police reports," and "bad faith" criminal prosecution could rise to a Fourteenth Amendment violation when malicious prosecution was based on racial discrimination violative of the Equal Protection Clause. Leonetti alleges no such racial discrimination here. In the second case, *Goodwin v. Metts*, 885 F.2d 157, 163 (4th Cir. 1989), *rev'd on other ground sub nom., Durham v. Horner*, 690 F.3d 183, 189 (4th Cir. 2012), the Fourth Circuit held malicious prosecution could support a due process violation when an officer hid that someone else had confessed to the crime and urged the prosecution should continue. *Id*. at 159. *Goodwin*'s holding conflicts with the Ninth Circuit's jurisprudence in this area, is non-binding on this court, and involved affirmative government misconduct far more egregious than the alleged failings Leonetti relies on here. The court therefore finds the Fourth Circuit's reasoning in *Goodwin* unpersuasive and declines to extend it here.

PAGE 38 - FINDINGS AND RECOMMENDATION                    [AHS]

Finally, Defendant Clackamas County asserts the additional defense that it is not liable for Leonetti's § 1983 claim because the municipality itself did not cause the alleged violation.

A municipality cannot "be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). That is, "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue," *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989), specifically, "when execution of a government's policy or custom . . . inflicts the injury . . . ." *Monell*, 436 U.S. at 694. Leonetti does not appear to assert Clackamas County caused the constitutional violation at issue. Nor does he point to any injury-inflicting Clackamas County or CCSO policy or custom, and the court finds no evidence of such a policy or custom in the record.

Moreover, "[i]f a person has suffered no constitutional injury at the hands of the individual [] officer, the fact that []departmental regulations might have authorized the [violation] is quite beside the point." *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (per curium) ("[N]either *Monell* . . . , nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm."); *see also Simmons v. Navajo Cty., Ariz*., 609 F.3d 1011, 1021 (9th Cir. 2010) (holding plaintiff could not maintain a claim for municipal liability because "there was no underlying constitutional violation"). Because, as previously explained, no underlying constitutional violation occurred, Defendant Clackamas County is not liable under § 1983.

Accordingly, all Defendants are entitled to summary judgment on Leonetti's federal claim.

B.    *Qualified Immunity.*

Even if Leonetti could establish any of his constitutional rights were violated, Defendants

Bray, Shipley, Kollias, and Pierce are qualifiedly immune from § 1983 liability.

Qualified immunity shields § 1983 defendants "[f]rom liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent of those who knowingly violated the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation and internal quotations omitted). The key inquiry in determining whether an officer is entitled to qualified immunity is whether he or she has "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002). To determine whether the doctrine of qualified immunity applies to an individual defendant, the court must decide whether a plaintiff has shown a constitutional or statutory right has been violated and whether the right at issue was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The individually named Defendants are entitled to qualified immunity under *Saucier*'s first prong because, as explained *supra* in Part III.A, they violated no constitutional right.

The individual Defendants are likewise qualifiedly immune under the second prong of *Saucier*.

The clearly established inquiry "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2009). Officials may be held liable only for violation of a right the "contours [of which are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id*. at 202. Therefore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he

confronted." *Id*. The law need not necessarily be a "precise formulation of the standard." *Id*. Rather, to be clearly established, "various courts [must] have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id*. With respect to qualified immunity in the specific context of probable cause, the Supreme Court considers "the fact that a neutral magistrate has issued a warrant[] the clearest indication that the officers acted in an objectively reasonable manner," noting immunity in such situations is lost only "when it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Messerschmidt v. Millender*, 565 U.S. 535, 546–47 (2012); *see e.g., Torres v. Goddard*, 194 F. Supp. 3d 886, 893, 895 (D. Ariz. 2016) (granting qualified immunity to defendants acting pursuant to seizure warrants because "even assuming that probable cause [supporting the warrants] was insufficient," there was "no evidence that the [supporting] affidavits and materials were so lacking in indicia of probable cause as to render Defendants' official belief in probable cause entirely unreasonable.")

Applied to the facts of this case, the question here is whether it would have been sufficiently clear to a reasonable official that arresting, investigating, and assisting in prosecuting Leonetti was unlawful. The answer depends on whether a reasonable official would have understood that he or she acted without probable cause or, more specifically, whether he or she would have concluded that the arrest warrant was so lacking in indicia of probable cause it should never have been issued.

Defendants in fact had sufficient probable cause to justify their actions throughout Leonetti's arrests, investigation, and prosecution. Thus, the lesser-included standard of whether it would have been objectively clear to them that they acted with probable cause is necessarily met. But even if probable cause was at any point lacking, as the court's analysis in Part II makes clear, no reasonable

officer would have thought his or her conduct was unlawful based on the totality of facts that presented here — facts that both a neutral judge and a grand jury concluded supported probable cause. Furthermore, as in *Messerschmidt,* here it is hardly obvious that no reasonably competent officer would have concluded that neither the arrest warrant nor grand jury indictment should have issued. Therefore, the individually named Defendants in this action are entitled to qualified immunity from Leonetti's § 1983 claim.

III.    State Law Claims.

Leonetti also asserts claims for false arrest, malicious prosecution, and loss of consortium under Oregon law.

A.    *Individual Liability Under the Oregon Tort Claims Act.*

The individually named Defendants invoke ORS 30.265 to assert they are immune from tort liability under state law arguing that, under the OTCA, Clackamas County, as a public body, is the only proper defendant. Defendants do not specify to which portion of ORS 30.265 they refer, but regardless, it appears this argument relies on outdated law.

Before 2011, the only remedy available for torts committed by officers, employees, or agents of a public body in Oregon within the scope of their employment was an action against the public body. OR. REV. STAT. 30.265(1) (2009). However, the Oregon Supreme Court in *Clarke v. OHSU*, 343 Or. 581, 585–86, 610 (2007), held that the law violated Oregon's constitution in circumstances in which a public body would be "substituted" as a proper defendant, in turn "capping" damages under another OTCA provision that imposes limits on damages recoverable from public bodies, thereby denying adequate recourse for plaintiffs incurring damages far beyond the public body cap. Accordingly, Oregon lawmakers revised ORS 30.265 to allow plaintiffs to bring a tort claim against

individual defendants if damages exceeded certain specifically enumerated amounts. *See* 2011 Or.

Laws. Ch. 270 § 1;  OR. REV. STAT. 30.326(3)–(4); 30.271–73 (2012).

 Oregon Revised Statute 30.265 currently provides:

> (3) If an action under ORS 30.260 to 30.300 alleges damages in an amount equal to or less than the damages allowed under ORS 30.271, 30.272 or 30.273, *the sole cause of action for a tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties . . . is an action against the public body*. If an action is filed against an officer, employee or agent of a public body, and the plaintiff alleges damages in an amount equal to or less than the damages allowed under ORS 30.271, 30.272 or 30.273, the court upon motion shall substitute the public body as the defendant . . . .

> (4) If an action under ORS 30.260 to 30.300 alleges damages in an amount greater than the damages allowed under ORS 30.271, 30.272 or 30.273, *the action may be brought and maintained against an officer, employee or agent of a public body, whether or not the public body is also named as a defendant.* An action brought under this subsection is subject to the limitations on damages imposed under ORS 30.271, 30.272 or 30.273, and the total combined amount recovered in the action may not exceed those limitations for a single accident or occurrence without regard to the number or types of defendants named in the action.

OR. REV. STAT. 30.265(3)–(4) (emphasis added).  Oregon Revised Statutes 30.271, 30.272 and

30.273 impose limits on tort damages recoverable from the state and local public bodies for

"personal injury and death" and "property damage or destruction," adjusted annually for inflation.

Therefore, when a plaintiff asserts a claim against both a public body and employee of that

public body, and the record supports a damage claim exceeding the OTCA cap for the public body,

the plaintiff should be allowed to proceed against the individual defendant to avoid the state

constitutional violation articulated in *Clarke*. *See Johnson v. Gibson*, 918 F. Supp. 2d 1075, 1081

(D. Or. 2013), *vacated and remanded on other grounds*, 652 F. App'x 565 (9th Cir. 2016)

(summarizing the aforementioned framework and, accordingly,  denying city-employee defendants'

motion for substitution); *see also Kramer v. S. Oregon Univ.,* No. 1:13-CV-00340-CL, 2013 WL

4782154, at *6 (D. Or. Sept. 5, 2013) ("Under the [OTCA] an officer . . . of a public body may be held personally liable only when the requested prayer for relief exceeds the damages cap allowed under ORS 30.271, 30.272 or 30.273. In this case, the requested prayer for relief does exceed the damages cap, and the defendants have conceded that Cullinan is therefore a properly named defendant."); *Clardy v. Jones*, No. 2:15-CV-01241-CL, 2017 WL 1528720, at *2, n.1 (D. Or. Apr. 23, 2017) (noting ORS 30.265(4)'s new rule and stating "[t]he statutory cap for a single claimant bringing a cause of action between July 1, 2015 and July 1, 2016 is $2,048,300. *See* O.R.S. 30.271(4) and [the applicable table of liability limits available online.] Plaintiff's complaint alleges damages in excess of this amount.").

Based on Leonetti's complaint, his malicious prosecution action arose at the latest in February 2015, when his case was dismissed. The statutory cap for a cause of action alleging personal injury against a local public body between July 1, 2014 and July 1, 2015 for a single claimant is $666,700, and $1,333,300 for multiple claimants. *See* "Oregon Tort Claims Act Liability Limits," Oregon Judicial Branch, available at http://www.courts.oregon.gov/Documents/Table_of_Liability_Limits.pdf (last accessed, February 16, 2018). Leonetti, personally and on behalf of Holly Leonetti's estate, alleges damages not to exceed $ 7,500,000. (Compl. ¶ 24.) Leonetti's complaint does not specify what portion of those damages was incurred as a result of his alleged malicious prosecution. Still, because the damages alleged substantially exceed the applicable liability limit, under ORS 30.265(4) and *Clarke* and its progeny, procedurally, Leonetti likely should be allowed to proceed against individual Defendants Bray, Shipley, Kollias, and Pierce.

B.    *False Arrest Claim.*

As discussed *supra* in Part I.A, Leonetti's state false arrest claim is time barred under the

two-year statute of limitations imposed by the OTCA.  However, even if it were timely, on this record the claim would fail on the merits because Leonetti has not created a question of fact.

Under Oregon law, the "gravamen of the [false arrest] claim is the unlawful imposition of restraint on another's freedom of movement." *Hiber v. Creditors Collection Service*, 154 Or. App. 408, 413 (1998) (internal quotation omitted).  A false arrest claim consists of four elements: (1) the defendant must confine the plaintiff; (2) the defendant must intend the act that causes confinement; (3) the plaintiff must be aware of the confinement; and (4) the confinement must be unlawful.  *Id*. And, in Oregon, too, "the existence of probable cause [] render[s] an arrest lawful as a matter of law." *Miller v. Columbia Cty*., 282 Or. App. 348, 355 (2016), review denied, 361 Or. 238 (2017). Thus, "by rendering an arrest lawful, the existence of probable cause for the arrest necessarily defeats a claim of false arrest." *Id*. (citing *Le Roy v. Witt*, 12 Or. App. 629, 631, 508 P.2d 453 (1973)). Again, it is the trial court's duty to determine, as a matter of law, whether a defendant arrested with probable cause.  *Id*. (citing *Gustafson*, 269 Or. at 358 ("[I]t is the court's function, not the jury's function, to determine the issue of probable cause.")).

 Because, as explained *supra* in Part II, the court determines detectives had probable cause to arrest Leonetti, both on June 10 and June 12, 2013, under *Miller*, the arrests were lawful as a matter of law and Leonetti's false arrest claim necessarily fails.

C.    *Malicious Prosecution Claim.*

To recover for the tort of malicious prosecution in Oregon, a plaintiff must prove: (1) the institution or continuation of the original criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceeding; and (6) injury or damage because of the

prosecution." *Rose v. Whitbeck,* 277 Or. 791, 795, *reh'g denied and opinion modified,* 278 Or. 463

(1977). Malice may be necessarily inferred when a prosecution is initiated without probable cause.

*Ledford v. Gutoski*, 121 Or. App. 226, 232 (1993), *aff'd*, 319 Or. 397 (1994) ("instituting a criminal

proceeding against another for a purpose other than that of achieving justice is, by its nature, an act

from which the intent to do harm must necessarily be inferred.")

Thus, proof of probable cause is also complete defense to an action for malicious

prosecution. *Gustafson*, 269 Or. at 356. Voluntary dismissal of a charge "does not automatically

create a presumption that [it] was filed without probable cause." *Roop v. Parker Nw. Paving, Co.*,

194 Or. App. 219, 239 (2004); *accord. Shoemaker,* 220 Or. at 578. Further, in Oregon, "[a]ctions

for malicious prosecution are not favored by the law because public policy requires that those who

have good reason to believe that the law has been violated should be encouraged to bring that

information to the attention of the law enforcement authorities, to the end that those guilty of crime

may be brought to trial and punished." *Lampos*, 270 Or. at 266 (citing *Hees v. Oregon Baking Co.*,

31 Or. 503, 513 (1897), and *Nally v. Richmond*, 105 Or. 462, 466 (1922)). Accordingly, "limitations

have been placed upon such actions, including the requirement that the plaintiff must sustain the

burden of proof that the defendant did not have probable cause to initiate the criminal prosecution."

*Id*. (citing *Shoemaker,* 220 Or. at 579 and Prosser, LAW OF TORTS 841, § 119 (4th ed 1971)).

Defendants first argue that because it was District Attorney Regan who made the specific

charging decision against Leonetti, the defendant CCSO detectives and sergeants cannot be held

liable for malicious prosecution.

This argument fails. It is well established under both Oregon and federal law that malicious

prosecution actions are not limited to suits against only prosecutors, but rather may be brought

against any person who has wrongfully initiated or caused charges to be filed. *Hryciuk*, 213 Or. at 561 (holding "if the defendant has knowledge of facts which would exonerate the accused, he cannot justify his proceeding upon the criminal charge in an action for malicious prosecution" after defendant procured his son to testify falsely against the plaintiff); *Rogers v. Hill*, 281 Or. 491, 500 (1978) (en banc) ("An active part in continuing an unfounded criminal proceeding is sufficient for this tort"); *see e.g., Gumm v. Heider*, 220 Or. 5, 17 (1960) (malicious prosecution action against party to a contract who "institut[ed] the prosecution" of the plaintiff); *Rose,* 277 Or. at 795 (malicious prosecution action brought by plaintiff against her brother- and sister-in-law). To the extent Defendants also assert this defense against Leonetti's § 1983 claim, it likewise fails.

However, Defendants are not liable for malicious prosecution under state law because they acted with probable cause to investigate and prosecute Leonetti for the crimes charged. Here too, Defendants' probable cause, set forth *supra* in Part II.D, under *Gustafson* serves as a complete defense to Leonetti's malicious prosecution claim. As explained in *Roop*, that the charges were later voluntarily dismissed does not necessarily imply a lack of probable cause.

Leonetti argues summary judgment as to his malicious prosecution claim is inappropriate because the question of whether defendants acted maliciously is one for the jury. Leonetti is correct that "[m]alice, unlike probable cause, is a question for the jury." *Gustafson*, 269 Or. at 366. Malice is necessary, but not alone sufficient to prove malicious prosecution; because probable cause exists as a complete defense to such a claim, proof of malice is irrelevant if a defendant can prove he or she acted with probable cause. Because Leonetti fails to carry his burden to present facts sufficient to create a question that no probable cause existed, the jury question of malice does not preclude judgment on his malicious prosecution. That is, even if Leonetti can prove any of the defendants

acted with malice, because they likewise acted with probable cause, the claim fails as a matter of law.

Leonetti also cites *Hoefer v. Cope*, 40 Or. App. 275, 281 (1979), for the proposition that a defendant's failure to "inquire []thoroughly into the facts" of an alleged crime raises a jury question about malice," rendering summary judgment inappropriate. That interpretation misconstrues *Hoefer*.

Hoefer entered a hardware store to buy a socket extension. *Id.* at 277. He put the small extension in his pocket to avoid it falling through the cracks of his shopping cart, but forgot to pay the $2.15 for the extension in his pocket when paying for other items at the checkout. *Id.* at 277–78. When a store security guard ordered him to sign a confession to shoplifting the extension, Hoefer tried to explain the mistake, but the guard refused the explanation and notified the police. *Id.* at 278. Hoefer was later acquitted of shoplifting charges and sued the guard for malicious prosecution, arguing he lacked probable cause to call the police. *Id*. at 279. The trial court granted summary judgment for the guard, but the Oregon Court of Appeals reversed, holding summary judgment was inappropriate because "a reasonable person . . . would have given fair consideration to the possibility of a mistake and would have made further inquiries," and the "circumstances suggest[ed] a reasonable possibility of an innocent explanation for the failure to pay[;]" therefore, "the institution of criminal proceedings without [further] investigation . . . c[ould ]not be held to be with probable cause as a matter of law." *Id.* at 281–82 (internal quotation omitted).

Thus, summary judgment was precluded in *Hoefer* not by a reasonable possibility of malice, but by the possible absence of probable cause. Again, if probable cause exists as a matter of law, then summary judgment is proper, regardless of whether a defendant acted with malice. *See Mathre v. Multnomah Cty.*, 35 Or. App. 75, 79 (1978) (affirming summary judgment on malicious

prosecution claim where probable cause existed as matter of law).   As Leonetti fails to sustain the burden of proof that the defendants lacked probable cause to initiate and continue the criminal prosecution against him, his malicious prosecution claim fails.  And because there is no underlying claim, Clackamas County is likewise not liable for malicious prosecution under Oregon law.

> D.    *Loss of Consortium Claim*.

Finally, Defendants move for summary judgment as to the loss of consortium claim brought on behalf of Holly Leonetti's estate.

Defendants assert Holly Leonetti cannot recover for loss of consortium because Joseph Leonetti suffered no physical injury, citing *Panasewich v. Dayton Hudson Corp*., No. CV-98-134-ST, 1999 WL 446884, at *11 (D. Or. Apr. 28, 1999).   Leonetti responds, and the court agrees, that Oregon law in this area remains unsettled.

 Panasewich was repeatedly verbally sexually harassed, but never physically touched, by a male coworker, which led to marital difficulties with her husband, who then moved out of the couple's home. *Panasewich*, 1999 WL 446884, at *1–*2.  Panasewich sued the coworker and the company for, among other claims, negligent infliction of emotional distress, and her husband brought a claim for loss of consortium.  *Id*. at *4, *7, *11.  Applying Oregon law, the court rejected the negligent infliction of emotional distress claim because the tort requires a plaintiff show physical harm or injury to a legally protected interest, for example the negligent removal of a deceased spouse's remains; not "solely psychic or emotional injury," like the verbal harassment Panasewich alleged. *Id*. at *9.  The court cited *Shoemaker v. Management Recruiters Int'l, Inc.*, 125 Or. App. 568, 865 P.2d 1331 (1993), to note "the physical injury requirements for negligent infliction of emotional distress and loss of consortium are very similar." *Id*.  Hence, the court inferred that

because a loss of consortium claim "is based on injuries peculiar to a plaintiff that were the consequence of tortious injury suffered by the plaintiff's spouse," the husband's claim necessarily failed for the same reasons as his wife's negligent infliction of emotional distress claim. *Id*. at \*11 ("[F]or the reasons noted in the analysis of the negligent infliction of emotional distress claim, the physical injury alleged in this case is insufficient for a loss of consortium claim under *Shoemaker*.).

Despite the inference drawn in *Panasewich*, the suggestion that *Shoemaker* established a bright-line physical-injury requirement for loss of consortium in Oregon may be overstated.  In fact, the Oregon Court of Appeals in *Shoemaker* recognized that "[w]hether such an allegation is required to state a claim for loss of consortium" was, in 1993, "a question of first impression in Oregon." *Shoemaker*, 125 Or. App. at 573.  But the *Shoemaker* court did not answer that question, because the plaintiff there had alleged physical injury sufficient to recover for negligent infliction of emotional distress. *Id*.  And it does not appear the Oregon Appellate Courts have ever revisited the issue.  As such, this court declines to adopt the interpretation of Oregon law Defendants suggest.

However, because all of Joseph Leonetti's claims against the Defendants fail, so too does Holly Leonetti's derivative loss of consortium claim.

It is clear under Oregon law that a spouse's loss of consortium claim "is measured by and subject to any defenses available in [the other spouse]'s action for redress of the same harm." *Ross v. Cuthbert*, 239 Or. 429, 432 (1964) (citing generally *Ellis v. Fallert* 209 Or. 406 (1957);  *Smith v. Smith*, 205 Or. 286 (1955); *Kinney v. Southern Pacific Co.* 232 Or. 322 (1962)).  This principle is true whether the defense is substantive; *id*. (injured spouse's contributory negligence was valid defense to other spouse's loss of consortium claim),  *Lakin v. Senco Prod., Inc.*, 144 Or. App. 52, 81(1996), *aff'd,* 329 Or. 62 (1999), *opinion clarified*, 329 Or. 369 (1999) (same); or procedural;

*Bibeau v. Pac. Nw. Research Found., Inc*., 980 F. Supp. 349, 358 (D. Or. 1997), *rev'd on other grounds*, 188 F.3d 1105 (9th Cir. 1999) (rejecting spouse's loss of consortium claim when other spouse's claims were barred by statute of limitations).

As explained above, Defendants are entitled to judgment as a matter of law on all of Joseph Leonetti's primary claims. Although the court is sympathetic to the situation that befell Holly Leonetti, because the same defenses apply to and bar her loss of consortium claim, summary judgment is likewise appropriate as to that claim.

Based on the record before the court, there is no genuine issue as to any material fact. Accordingly, Defendants are entitled to judgment as a matter of law on all claims.

## Conclusion

For the reasons stated above, Defendants' motion for summary judgment, ECF No. 15, should be GRANTED.

## Scheduling Order

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due March 5, 2018. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

/ / / / /

/ / / / /

/ / / / /

If objections are filed, then a response is due within 14 days after being served with a copy

of the objections.  When the response is due or filed, whichever date is earlier, the Findings and

Recommendation will go under advisement.

DATED this 16th day of February, 2018.


_____/s/ John V. Acosta_____
JOHN V. ACOSTA
United States Magistrate Judge